1  C. Brandon Wisoff (State Bar No. 121930)
   bwisoff@fbm.com
2  Eric D. Monek Anderson (State Bar No. 320934)
   emonekanderson@fbm.com
3  Farella Braun + Martel LLP
   235 Montgomery Street, 17th Floor
4  San Francisco, California 94104
   Telephone: (415) 954-4400
5  Facsimile: (415) 954-4480

6  Maeve L. O'Connor (*pro hac vice* application forthcoming)
   Elliot Greenfield (*pro hac vice* application forthcoming)
7  Debevoise & Plimpton LLP
   919 Third Avenue
8  New York, New York 10022
   Telephone: (212) 909-6000
9  Email: mloconnor@debevoise.com
   Email: egreenfield@debevoise.com
10
   Attorneys for Defendants
11 ROBINHOOD MARKETS, INC.;
   ROBINHOOD FINANCIAL LLC;
12 ROBINHOOD SECURITIES, LLC

13              **UNITED STATES DISTRICT COURT**

14              **NORTHERN DISTRICT OF CALIFORNIA**

15                   **SAN JOSE DIVISION**

16

17 DAN KEARNS, an individual; DOROTHY          Case No.:
   KEARNS, an individual; and SYDNEY
18 KEARNS, an individual,                      **NOTICE OF REMOVAL**

19              Plaintiffs,

20         vs.

21 ROBINHOOD FINANCIAL LLC;
   ROBINHOOD SECURITIES, LLC;
22 ROBINHOOD MARKETS, INC.; and DOES
   1-10,
23
                Defendants.
24

25

26

27

28

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

38567\13929005.1

1  TO THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

2  CALIFORNIA AND TO PLAINTIFFS DAN KEARNS, DOROTHY KEARNS AND

3  SYDNEY KEARNS AND THEIR COUNSEL OF RECORD:

4        Pursuant to 28 U.S.C. §§ 1332, 1441 and 1446, Defendants Robinhood Markets, Inc.,

5  Robinhood Financial LLC, and Robinhood Securities, LLC (collectively, "Defendants") hereby

6  remove the above-captioned action from the Superior Court of the State of California for the

7  County of Santa Clara to this Court based on the following grounds:

8  I.     PROCEDURAL HISTORY

9        1.      On February 8, 2021, Plaintiffs Dan Kearns, Dorothy Kearns and Sydney Kearns

10  (collectively, "Plaintiffs") filed this action, entitled *Dan Kearns et al. v. Robinhood Financial LLC*

11  *et al.*, Case No. 21-CV-375872, in the Superior Court of the State of California for the County of

12  Santa Clara.

13        2.      Defendants have not yet been served with the summons and complaint.  Copies of

14  all process, pleadings and orders available on the state court docket are attached as **Exhibit A**.

15        3.      This Notice of Removal is timely filed under 28 U.S.C. § 1446(b), which provides

16  that a defendant may file a notice of removal "within 30 days after the receipt by the defendant,

17  through service or otherwise, of a copy of the initial pleading setting forth the claim for relief."

18        4.      Copies of this Notice of Removal will promptly be filed with the Clerk of the

19  Superior Court of the State of California for the County of Santa Clara and served on Plaintiffs'

20  counsel of record pursuant to 28 U.S.C. § 1446(d).

21        5.      This case properly may be removed to this United States District Court pursuant to

22  28 U.S.C. §§ 1331, 1441 and 1446.  The Superior Court for the State of California for the County

23  of Santa Clara is located within the jurisdiction of the United States District Court for the Northern

24  District of California.

25  II.    REMOVAL IS PROPER UNDER 28 U.S.C. § 1332

26        6.      This Court has original jurisdiction over this action pursuant to 28 U.S.C.

27  § 1332(a)(1) because the suit is between "citizens of different States" and the "matter in

28  controversy exceeds the sum or value of $75,000."

**A.      The Parties Are Citizens of Different States**

7.      Plaintiffs are citizens of Illinois.  (Compl. ¶¶ 16-18.)

8.      Under 28 U.S.C. § 1332(c)(1), a corporation is a citizen of the state by which it has been incorporated and the state where it has its principal place of business.  Defendant Robinhood Markets, Inc. is a Delaware corporation with its principal place of business in Menlo Park, California, and is therefore a citizen of Delaware and California.  (Compl. ¶¶ 14, 21.)

9.      For purposes of diversity jurisdiction, a limited liability company "is a citizen of every state of which its owners/members are citizens."  *Johnson v. Columbia Properties Anchorage, LP*, 437 F.3d 894, 899 (9th Cir. 2006); *see also Meza v. Lowe's Home Centers, LLC*, No. 15-CV-02320, 2015 WL 5462053, at *2 (N.D. Cal. Sept. 16, 2015) (holding limited liability company to be a citizen of state in which sole member corporation was incorporated and had its principal place of business).

10.      Robinhood Financial LLC is a Delaware limited liability company.  Robinhood Markets, Inc. is the sole owner and member of Robinhood Financial LLC.  (Compl. ¶¶ 19, 21.) For purposes of diversity jurisdiction, therefore, Robinhood Financial LLC is a citizen of Delaware and California.

11.      Robinhood Securities, LLC is a Delaware limited liability company.  Robinhood Markets, Inc. is the sole owner and member of Robinhood Securities, LLC.  (Compl. ¶¶ 20-21.) For purposes of diversity jurisdiction, therefore, Robinhood Securities, LLC is a citizen of Delaware and California.

12.      The citizenship of fictitious defendants is disregarded for purposes of establishing removal jurisdiction under 28 U.S.C. § 1332.  *See* 28 U.S.C. § 1441(b)(1).

13.      To the extent Plaintiffs cite 28 U.S.C. § 1441(b)(2) to argue that the case may not be removed because "the parties in interest properly joined and served as defendants [are] citizen[s] of the state in which such action is brought," that argument fails because none of the Defendants has been served with the Complaint, as every Court of Appeal to have addressed this issue has held.  *Gibbons v. Bristol-Myers Squibb Co.*, 919 F.3d 699 (2d Cir. 2019); *Encompass Ins. Co. v. Stone Mansion Rest. Inc.*, 902 F.3d 147 (3d Cir. 2018); *McCall v. Scott*, 239 F.3d 808,

813 n.2 (6th Cir. 2001).  Although the Ninth Circuit has not yet addressed the issue, courts in this District have repeatedly held that "a defendant may remove an action prior to receiving proper service, even when the defendant resides in the state in which the plaintiff filed the state claim." *Sherman v. Haynes & Boone*, No. 14-CV- 01064-PSG, 2014 WL 4211118, at *1 & n.8 (N.D. Cal. Aug. 22, 2014) (citing cases); *see also Monfort v. Adomani, Inc.*, No. 18-CV-05211-LHK, 2019 WL 131842, at * 4 (N.D. Cal. Jan. 9, 2019) ("By its plain language, 28 U.S.C. § 1441(b)(2) permits an in-state defendant who has not been both joined and served to remove a case to federal court on the basis of diversity jurisdiction."); *Regal Stone Ltd. v. Longs Drug Stores Cal., LLC*, 881 F. Supp. 2d 1123, 1127 (N.D. Cal. 2012) (holding that courts in this district "hold that the clear and unambiguous language of the statute only prohibits removal after a properly joined forum defendant has been served").

**B.     The Amount in Controversy Requirement Is Satisfied**

14.     Although the Complaint does not state a specific amount of damages, courts have recognized that claims for wrongful death are sufficient to establish the requisite amount in controversy on the face of the complaint.  *See, e.g.*, *Kammerdiener v. Ford Motor*, No. 09-cv-2180, 2010 WL 682297 at *2 (C.D. Cal. Feb. 24, 2010) ("That Plaintiffs are seeking recovery for wrongful death is sufficient to establish that the amount in controversy exceeds $75,000 on the face of the complaint.").

**III.     CONCLUSION**

15.     For the reasons set forth herein, pursuant to 28 U.S.C. §§ 1331, 1441 and 1446, this action may be removed to this Federal District Court.

**WHEREFORE**, Defendants request that this action be brought to this Court, and that this Court make and enter such further orders as may be necessary and proper.

1    Dated:  February 9, 2021                    FARELLA BRAUN + MARTEL LLP

2

3                                               By:   */s/ C. Brandon Wisoff*
                                                      C. Brandon Wisoff

4
                                                Attorneys for Defendants
5                                               ROROBINHOOD MARKETS, INC.;
                                                ROBINHOOD FINANCIAL LLC;
6                                               ROBINHOOD SECURITIES, LLC

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

# EXHIBIT A

E-FILED
2/8/2021 9:51 AM
Clerk of Court
Superior Court of CA,
County of Santa Clara
21CV375872
Reviewed By: R. Walker

1  Benjamin Blakeman (SBN 60596)
2   *ben@lifeinsurance-law.com*
   **BLAKEMAN LAW**
3   11601 Wilshire Boulevard, Suite 2080
   Los Angeles, California 90025
4   (213) 629-9922

5   Ethan J. Brown (SBN 218814)
6    *ethan@bnsklaw.com*
   **BROWN NERI SMITH & KHAN LLP**
7   11601 Wilshire Boulevard, Suite 2080
   Los Angeles, California 90025
8   Telephone: (310) 593-9890
   Facsimile: (310) 593-9980
9

10  Marc Zussman (SBN  58732)
11   *marcz@zussmanseclaw.com*
   **LAW OFFICES OF MARC I. ZUSSMAN**
12  10100 Santa Monica Blvd., Suite 300
   Los Angeles, CA 90067
13  (424) 268-4024

14  *Attorneys for Plaintiffs*
15   Dan Kearns, Dorothy Kearns,
    and Sydney Kearns

16
17              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

18                   **FOR THE COUNTY OF SANTA CLARA**

19
   DAN KEARNS, an individual; DOROTHY          Case No.:   **21CV375872**
20  KEARNS, an individual; and SYDNEY KEARNS,
   an individual,                               **COMPLAINT FOR:**
21                                                 1.  **Wrongful Death;**
              Plaintiffs,                          2.  **Negligent Infliction of Emotional**
22                                                     **Distress; and**
       v.                                          3.  **Unfair Business Practices**
23
   ROBINHOOD FINANCIAL LLC; ROBINHOOD
24  SECURITIES, LLC; ROBINHOOD MARKETS,         **[Jury Trial Requested]**
   INC.; and DOES 1-10,
25
              Defendants.
26

27

28
   ───────────────────────────────────────────────
                          **COMPLAINT**

Plaintiffs Dan Kearns, Dorothy Kearns, and Sydney Kearns ("Plaintiffs") allege as follows:

## NATURE OF THE ACTION

1.      "How was a 20-year-old with no income able to get assigned almost $1 million worth of leverage?"  These were the last known written words of 20-year-old Alex Kearns before he rode his bicycle to a railroad crossing and ran in front of an oncoming train.  The only ones with the answer to Alex's question are Defendants Robinhood Markets, Inc, Robinhood Financial LLC, and Robinhood Securities, LLC (collectively, "Defendants" or "Robinhood"), a financial services company that offers a mobile app and website where virtually anyone who knows how to fill out a form asking about their name, age, and source of income (regardless of what that income may be) can invest in stocks, ETFs and options, regardless of their proficiency, experience, or the amount of money in their bank account.

2.      This case centers on Robinhood's aggressive tactics and strategy to lure inexperienced and unsophisticated investors, including Alex, to take big risks with the lure of tantalizing profits. Robinhood built out its trading platform to look much like a videogame to attract young users and minimize the appearance of real-world risk.  Though Alex was merely a senior in high school when he opened an account with Robinhood and had little or no income, Robinhood determined he was qualified enough to enter into the world of trading sophisticated financial options.  Not only did Robinhood permit Alex to open the account, but when Alex was a freshman in college later that year, it permitted him to trade options.  Those options it turned out had the potential of his becoming obligated to pay for over $700,000 in securities, an amount he had no possible means of paying.  Worse, Robinhood provided almost no investment guidance, and its customer "service" was virtually non-existent, consisting of automated e-mail replies devoid of any human contact or interaction.

3.      Robinhood's reckless tactics came to a head in June 2020.  On information and belief, Alex had placed an option spread trade whereby he simultaneously acquired and sold put options in the same security, in theory limiting his risk, but actually containing a risk Alex did not understand, which was the risk that the put options he had sold could be assigned before expiration, which resulted in his being obligated to purchase the underlying security at the strike price of the options, before he was able to sell the options he owned.

**COMPLAINT**

1

4.     On information and belief, this is in fact what occurred.  At some time during the trading day of June 11, 2020, the holder of the options Alex had sold exercised his options, thus obligating Alex to purchase the underlying security.  Alex did not learn this until later, when his account reflected a negative cash balance in his account of $730,000 which was more than $700,000 greater than the amount of cash he had in the world.  At that point, Alex was extremely concerned and upset.

5.     At 11:01 p.m. on June 11, 2020, Robinhood notified Alex via email that his account was restricted (preventing him from executing new trades or making withdrawals), which raised further alarm bells in Alex's mind.  Eleven minutes later, he was informed by another email that he had been assigned, which meant Alex was required to purchase the over $700,000 in shares that were the subject of the options.  The information available to Alex at that point indicated that he had somehow lost $730,000 on a trade which he had understood to be limited to a maximum loss of less than $10,000.

6.     Though it was nearly midnight when Robinhood sent these notifications, a desperate Alex promptly sent an email to its customer support seeking help and answers.  Robinhood's reply consisted of nothing more than an auto-generated reply, emphasizing a delay in response time and creating a case number.  Robinhood continued to fail Alex throughout the night.  At 3:26 a.m., Robinhood—ignoring Alex's prior inquiry—sent Alex an email entitled "Immediate Action Required: Reg T Call Due", informing Alex that his "account didn't meet the Regulation T cash requirements for [his] trades on June 10, 2020[,]" and that he was thus required to deposit $178,612.73 by June 17, 2020.  Alex's account had held only about $16,000 before Robinhood allowed him to trade the put spread which actually controlled hundreds of thousands of dollars' worth of securities.  He had no money to satisfy this margin call, and he had no one to contact who could explain what was going on.

7.     Tragically, Robinhood's communications were completely misleading, because, in reality, Alex did not owe any money; he held options in his account that more than covered his obligation, and the massive negative balance would have been erased by the exercise and settlement of the puts he held.

8.     Robinhood never bothered to explain this to Alex or to respond to his increasingly desperate pleas for help.  Alex's second email to customer support, sent June 12 at 7:16 a.m. stated he was incorrectly assigned more than he should have been and that the puts he purchased should have

covered the puts he sold.  Alex again asked for help but was again met with an auto-generated reply from Robinhood assigning a new case number.  Alex then attempted to reach out again, and out of desperation, threatened legal action to Robinhood.  He sent those emails less than two hours before the market opened on a regular business day, a time when most brokers were open for business.

9.  Though Alex's panic and confusion were clearly caused by Robinhood's misleading communications, Robinhood was impossible to reach at the most critical moment to repair the damage it had created.  At that point, Alex believed that he was obligated to repay the deficit in his account and feared that his family would somehow get stuck with the obligation unless he did something drastic to protect them.  He was in a complete panic.  His panic and desperation grew as he was unable to communicate over a number of hours with anyone at Robinhood. This resulted in a highly distressed mental condition in Alex, an uncontrollable impulse to commit suicide as the only option he could see. Alex rode to a railroad crossing on his bicycle and ran in front of an oncoming train, killing himself.

10.  Though a young and inexperienced individual with little money cannot possibly possess the sophistication needed to make sound trading decisions, let alone parse out and comprehend misleading communications from a broker-dealer, Robinhood created the illusion that those qualities are unnecessary.  In fact, Robinhood's website entices young, inexperienced users with the slogan: "Our goal is to make investing in financial markets more affordable, more intuitive, and more fun, no matter how much experience you have (or don't have)."

11.  By marketing its online trading platform like a video game, it implied that trading stock and options was a fun way to make money, perhaps even to get rich, without significant risk.  It coupled its marketing strategy with attractive incentives for young individuals with little or no income, such as no commissions, free stock, and the chance to receive additional free shares of a "glamour stock" by encouraging friends to sign up.  This campaign was wildly successful, as millions of young people responded to this campaign—it is certainly no wonder that young people such as Alex would find such offers appealing.

12.  As Robinhood would have it, it could lure unsuspecting individuals to use its trading platform and "play with" hundreds of thousands of dollars in leveraged money, regardless of the

suitability of such trades, all the while ignoring its obligation to provide a safety net of any sort, or even a customer support service where actual humans answer the phone or respond to emails.

13.     But this is not a game.  Defendants' reckless conduct directly and proximately caused the death of one of its victims.  The distress, and the suicide, of this victim was foreseeable.  Indeed, it was almost inevitable that an event like this would occur as a result of such reckless behavior.  Defendants cannot escape the consequences of their actions; they must be held accountable, not only to satisfy the demands of justice, but to discourage such flagrantly irresponsible actions by themselves and others.

## JURISDICTION AND VENUE

14.     The Court has personal jurisdiction over Defendants because the Robinhood Defendants' principal place of business is in this County in California.

15.     Venue is proper in this county in accordance with Section 395(a) of the California Code of Civil Procedure because Defendants are located in this county, authorized to do business in this county and the acts and omissions complained of herein occurred in this county.

## THE PARTIES

16.     Plaintiff Dan Kearns is the father of Alex, residing at Naperville, IL.

17.     Plaintiff Dorothy Kearns is the mother of Alex, residing at Naperville, IL.

18.     Plaintiff Sydney Kearns is the sister of Alex, residing at Naperville, IL.

19.     Upon information and belief, Defendant Robinhood Financial LLC ("RHF") is a Delaware Limited Liability Company, a registered introducing broker specializing in financial services. RHF accepts orders from customers to buy and sell such securities, manages customer relationships and communications, customer support, and sends trades to Robinhood Securities, LLC ("RHS") to be cleared and settled.

20.     Upon information and belief, Defendant Robinhood Securities, LLC ("RHS") is a Delaware Limited Liability Company, a registered clearing broker specializing in financial services.

21.     Upon information and belief, Defendant Robinhood Markets, Inc. ("RHM") is a financial services company incorporated in the State of Delaware and is the parent company of RHF and RHS.

22.     On information and belief, RHF, RHS, RHM are subject to myriad SEC and FINRA rules governing broker-dealers including, among others, requirements related to customer protection, options trading, margin trading, fair dealing, and net capital.

23.     The precise role of each of the named Defendants with respect to the matters upon which this complaint is based is presently unknown and is therefore not specified herein.  Plaintiffs will seek leave of the court to amend this complaint to specify the precise role and to assign responsibility to each of the Defendants as appropriate when the relevant facts become known.  Until that time, Plaintiffs will refer to the three named Defendants collectively as "Robinhood" or "the Robinhood Defendants".

24.     Plaintiffs are also unaware at the time of filing of this complaint of whether there are other persons or entities that also share in the responsibility for the acts complained of herein, and therefore sues such defendants under fictitious names "DOES 1-10."  Plaintiffs will seek leave of the court to amend this complaint to state the names of the fictitious defendants when the same become known to Plaintiffs.

25.     Each of the Robinhood Defendants and each of the fictitious defendants are believed in good faith to be the agents, servants and employees of the others in doing, conspiring, aiding, abetting, or otherwise cooperating in performing those acts, and as such, is legally responsible in some manner for the acts complained of herein.

## **GENERAL ALLEGATIONS**

**A. Alex, Who Exemplified Kindness and Passion Throughout His Life, Was Loved and Admired By Those Who Knew Him**

26.     Alex grew up in Naperville, Illinois, with his two parents and sister.  Alex was shy as a little boy but became outgoing and active in high school and college. took great joy in learning, exploring, and had an intellectual curiosity.  Alex had a heart of gold and was loved by his peers.

27.     Alex showered his mother Dorothy with "Alex time", which meant warm hugs and affection.  Alex was described as the "kid who put a blanket on you when you fell asleep in front of the TV."

28.     Alex deeply loved his sister Sydney and shared with her a common love of Mario Kart, baking and cooking.  They shared a deep and close sibling bond.

29.     Alex's love for learning was widely recognized and applauded.  In middle school, Alex received the President's Education Award, which is given by the White House.  The Exchange Club of Naperville recognized Alex for his "outstanding dedication to a high quality of community service, scholarship, citizenship, and friendship."  Alex received the Jordan Webb Peace Award, which is given to individuals who "personified perseverance and courage in the face of adversity with an undying spirit and positive attitude."  Alex received the Jordan Webb Peace Award in recognition of his selfless nature, kindness, and desire to help others.

30.     Alex had musical talent, which was nurtured from the time he entered high school until his death.  His high school, Neuqua Valley High School, boasts a world-class music program and a perennial Grammy Signature School winner, including "Best in Nation" in 2005 and 2013.  As part of Neuqua Valley High School's band, Alex played trombone in the Outback Bowl Parade and toured Italy. His talent, leadership and popularity led to his designation as a senior leader in the band.

31.     The love felt by Alex's peers and teachers for him was palpable.  At the end-of-year awards ceremony during Alex's senior year of high school, Alex did not win an award.  Deciding that Alex was too deserving to go home without one, Alex's fellow students and teachers surprised him by calling him to stage, while everyone in the room gave a standing ovation.  Cheering and shouting filled the bleachers and room by all, showing their love for Alex.

32.     Alex finished his senior year in high school playing in a calypso band.  He even developed some unorthodox dance moves during that time—dance moves that may have reminded some of Elaine Benes of Seinfeld, but which brought a smile to Alex's face and those around him.  Alex was having fun and enjoying his life.

33.     As Alex graduated, he received a final award from Neuqua Valley High School—the Leslie Baumann Spirit Award.  The Leslie Baumann Spirit Award is given to only one student, a student "whose participation in a variety of events lifts school spirit by encouraging others to be enthusiastically engaged."

34.     After graduating from high school, Alex told his parents of his dream to  serve in the United States Air Force.  Alex had received a scholarship to the University of Nebraska at Lincoln ("UNL").  As a way to pursue his dream, he enrolled in the R.O.T.C. program at UNL.

35.     Alex was passionate about the R.O.T.C. program at UNL.  He especially enjoyed the comradery and purpose behind serving his country.  Alex pushed himself further than required and independently conceived, wrote, and edited recruitment videos for the UNL Air Force R.O.T.C. and the Arnold Air Society.  Alex even starred in and narrated the video for the Arnold Air Society, showing others his passion and sense of humor.  Alex was surprised to learn that UNL was so impressed by his efforts, that it granted him additional scholarship money.

36.     Those that were close to Alex knew he was a true goofball with a terrific sense of humor.  Alex often struggled to keep a straight face, and loved to imitate characters, particularly from Saturday Night Live.  While Alex was an Arnold Air Society recruit, one of the members got in his face and told him to sing a song.  Alex responded by breaking out into Mariah Carey's "All I Want For Christmas".  Though he tried to keep a straight face, the Arnold Air Society member could not keep himself from laughing at Alex's unexpected and hilarious reaction.

**B. Professional Broker-Dealers Owe A Duty Of Care To Their Customers**

37.     Every professional broker-dealer owes its customers a duty of care defined by common practice and by common and statutory law. They are also regulated by the Financial Industry Regulatory Authority ("FINRA"), which is charged by Congress to protect investors and ensure that professional broker-dealers operate fairly and honestly.  Included under FINRA's purview are trades in equities, corporate bonds, securities futures, and options.  Among other things, FINRA licenses individuals and promulgates rules for licensed brokers and dealers to follow.

38.     FINRA has promulgated specific rules to guide broker-dealers in how to fulfill their duty of care to their customers.

39.     As a starting point, licensed broker-dealers have a duty to take measures to "know" their customers.  This duty is crucial; without knowing enough information about a customer, a broker-dealer runs the risk of breaching its duty to care to protect its customers' financial interests in allowing or executing trades.  FINRA enumerates several things broker-dealers should do to Know Your Customer ("KYC"), including, but not limited to: confirmation of the identity of customers; confirmation of customers' employment status; confirmation of customers' income; verification of customers'

**COMPLAINT**

7

investment experience; confirmation of customers' net worth; an understanding of customers' investment objectives; and verification of customers' source of income to ensure they have adequate funds to trade.

40.     Broker-dealers also have a duty to their customers to ensure investment strategies in general and particular trades are suitable for them.  FINRA Rule 2111 defines this duty and provides that brokers must have a firm understanding of both the product and the customer.  Ensuring suitability safeguards investor protection and promotes fair dealing and ethical sales practices.  Although Robinhood has tried in public statements to disclaim this obligation on the grounds that it does not "recommend" specific securities, on information and belief, Robinhood does make recommendations of trading strategies and investment plans that would bring it within the purview of the Rule by, among other things, encouraging frequent trading, encouraging and repeatedly offering options trading, rewarding customers for frequent trading, publishing and sending to customers lists of popular stocks or stocks that are moving price-wise,, and similar actions.

41.     Broker-dealers have further specific duties of care to their customers with regard to options trading.  FINRA Rule 2360 imposes requirements on brokers to fulfil this duty; under Rule 2360, broker-dealers are required to collect certain customer information to determine whether to approve the customer's request to trade options.

42.     Broker-dealers also have a duty of care to their customers with regard to margin borrowing.  FINRA Rule 4210 establishes that this duty is met by imposing margin requirements which determine the amount of collateral customers are expected to maintain in their margin accounts to prevent defaults.

43.     Every broker-dealer registered and licensed under FINRA is required to abide by FINRA's rules.  Failure to do so is prima facie evidence of a breach of a duty of care.

**C. Though Licensed As A Professional Broker-Dealer, Robinhood Acts As Anything But, And Excuses Itself From Meeting Any Duty Of Care To Its Customers**

44.     Upon information and belief, Robinhood, registered in 2013 as a broker-dealer, is regulated by FINRA and required to provide a duty of care to its customers.  Nonetheless, Robinhood, embraced few of the qualities of a professional financial services company and "excused" itself from compliance with many of its duties and responsibilities.  Although the specifics of Robinhood's

compliance (and lack of compliance) with FINRA rules, including those referenced above, is uniquely within Robinhood's exclusive possession and control, on information and belief, the allegations contained in the following eight paragraphs constitute material failures to comply with its duties to customers and/or compliance with FINRA rules and obligations.

45.     First, Robinhood glosses over its duty to know its customers.   David Dusseault ("Dusseault"), President and COO of RHF, admitted to Congress that Robinhood only follows up with verifying customers' identifying information "in instances of uncertainty or where we are unable to verify information submitted through third parties."   *See* Dusseault Letter (Aug. 7, 2020), https://s.wsj.net/public/resources/documents/RobinhoodReplyToCongress.pdf.   Robinhood does not explain what constitutes "uncertainty" or when it deems necessary to make an effort to verify information on its own.  Moreover, Dusseault indicated that the type of information it verifies with third parties merely pertains to age and identity.  *Id*.  Thus, Robinhood relies mostly on the word of its users, significantly with regard to source of income and employment status, even when such answers create a red flag as to suitability for trading options.   Robinhood's system—taking customers at their words—falls woefully short of meeting its duty of care to ensure the customers should be trading as well as verifying the types of trades are appropriate.

46.     Without knowing its customers at all, Robinhood does not—and cannot—fulfill its duty to ensure a particular trade or type of trade is suitable for its users.   Upon information and belief, Robinhood has justified its behavior by contending that FINRA 2111 only applies to brokers giving investment recommendations, which Robinhood does not do.  But Robinhood may not excuse itself from its duty to ensure trades or type of trading are suitable for its customers.  First, FINRA itself states that the phrase "investment strategy involving a security or securities in this Rule is to be interpreted broadly, and would include, ***among other things***, an explicit recommendation to hold a security or securities." *See* FINRA Rules and Guidance, Rule 2111, Supplemented Material: .03, https://www.finra.org/rules-guidance/rulebooks/finra-rules/2111.   Second, Robinhood minimizes FINRA 2111 to a verbatim interpretation that ignores the purpose behind the rule, which is to ensure broker-dealers meet their duty of care to their customers by ensuring they engage in appropriate and sound trading.

47.     Third, Robinhood fails to meet its duty of care to its customers engaging in options trading.  FINRA Rule 2360 promulgates what Robinhood needs to do to meet these duties, i.e., perform diligence to determine whether to approve a customer's request to trade options.  But instead of doing anything to meet this duty of care, Robinhood merely has its customers fill out a form when opening the account.  *See* David Dusseault Response to Congressional Letter of July 13, 2020 ("Dusseault Letter") (Aug. 7, 2020), https://s.wsj.net/public/resources/documents/RobinhoodReplyToCongress.pdf. Robinhood then relies on the users' own representations about their experience, knowledge, age, employment status and estimated annual income.  Upon information and belief, Robinhood has no program in place to either verify the accuracy of the answers provided or to independently seek the necessary information.  Robinhood's system cannot possibly meet its duty to protect its customers from making unsound and volatile options trading decisions, or even trading at all.

48.     Additionally, Robinhood essentially approves Level 3 options trading for traders who lack the experience to understand the trades they are making or the financial ability to deal with the consequences of their trades.  As Dusseault stated to Congress, users with Level 2 access can qualify for Level 3 access simply by providing a self-certification regarding his or her understanding of options trading, as well as statements as to his or her trading activity and net worth.  *Id*.  And  "[f]or users who do not currently have access to options trading and are applying for Level 3 access, a customer can qualify if he or she states a certain number of years of options trading experience."  *Id*.  Moreover, while users that state they do not have much experience in investment cannot open an options account, all they need to do to gain access is revise their answer.  *See* Gunjan Banerji, Alexander Osipovich, *Free Trades, Jackpot Dreams Lure Small Investors to Options*, The Wall Street Journal (Jun. 24, 2020), https://www.wsj.com/articles/free-trades-jackpot-dreams-lure-small-investors-to-options-11592991000?st=0vx2z6r6lckh1tf&reflink=article_imessage_share.

49.     Further, while Robinhood provides its customers with the Options Clearing Corporation's Characteristics and Risks of Standardized Options ("ODD") booklet at the time a customer applies to trade options, upon information and belief, Robinhood does nothing to ensure customers understand the ODD or to provide a way for customers to ask questions related to same.  *See* Dusseault Letter (Aug. 7, 2020), https://s.wsj.net/public/resources/documents/RobinhoodReplyToCongress.pdf.

**COMPLAINT**

50.     Fourth, Robinhood fails to meet its duty of care to its customers trading on margin. Robinhood allows its users to purchase securities on margin through its Robinhood Gold program, as long as they subscribe. *Id.* In his August 7 letter to Congress, Dusseault boasted that Robinhood, though "not required by law or regulation" imposed eligibility criteria for trading securities on margin. *See* Dusseault Letter (Aug. 7, 2020), https://s.wsj.net/public/resources/documents/RobinhoodReplyToCongress.pdf. However, once again Robinhood's "vetting" consists of nothing more than asking customers questions and relying on their answers, without any verification system in place. *Id.* This can and does result in customers incurring margin obligations they cannot possibly satisfy, without any understanding the risks they are taking.

51.     Fifth, Robinhood breaches its duty of care to its customers by failing to provide any meaningful customer support. With all of its programs, Robinhood does not provide a single phone number for its users to call with questions. *See* Dusseault Letter (Aug. 7, 2020), https://s.wsj.net/public/resources/documents/RobinhoodReplyToCongress.pdf. Instead, Robinhood boasts about its "quick" and reliable email support, the same "support" that failed to substantively respond to Alex's questions and pleas multiple times. *Id.*

52.     Indeed, Robinhood has been described as "built for the person who doesn't know a lot about the markets and doesn't ask a lot of questions." *See* Charles Gasparino, *Robinhood app luring and robbing amateurs—like in the dot-com era,* New York Post (Aug. 8, 2020), https://nypost.com/2020/08/08/robinhood-app-luring-and-robbing-amateurs-like-in-the-dot-com-era/.

**D. Robinhood Preys On Inexperienced And Unsophisticated Investors, Much Like Alex**

53.     As Alex was busy learning and exploring his interests as he grew up in Naperville, he could not have known that Robinhood would one day, using aggressive tactics, prey on his youth and inexperience to further its own business interests.

(i)     Robinhood Designed Its App To Appear Like A Video Game

54.     Robinhood uses multiple marketing ploys to lure in its customers. First, Robinhood designed its app to appear much like a video game meant for teenagers or children. For instance, upon information and belief, users are congratulated on their first trade by confetti. *See* Annie Massa, Edward Robinson, *Robinhood's Role in the 'Gamification' of Investing,* Bloomberg (Dec. 19, 2020),

1  https://www.bloomberg.com/news/articles/2020-12-19/robinhood-s-role-in-the-gamification-of-

2  investing-quicktake.  Upon information and belief, users are also offered a fractional share of a "glamour

3  stock" (such as Apple) if they convince a friend to sign up.  *Id.*  Users can also browse 100 widely-held

4  stocks amongst fellow users for inspiration and view Tik-Tok videos glamorizing Robinhood's app.  *Id.*

5  *See also* Robin Wigglesworth, Richard Henderson, Eric Platt, *The lockdown death of a 20-year old day*

6  *trader*, Financial Times (Jul. 2, 2020),  https://www.ft.com/content/45d0a047-360f-4abf-86ee-

7  108f436015a1 (in reference to Robinhood's app, noting "[t]he parallels between video games and day

8  trading is becoming closer and closer"); Jeff Kauflin, Antoine Gara, Sergei Klebnikov, *The Inside Story*

9  *of Robinhood's Billionaire Founders, Option Kid Cowboys and the Wall Street Sharks that Feed on*

10  *Them*, Forbes (Aug. 19, 2020), https://www.forbes.com/sites/jeffkauflin/2020/08/19/the-inside-story-of-

11  robinhoods-billionaire-founders-option-kid-cowboys-and-the-wall-street-sharks-that-feed-on-

12  them/?sh=33aea449268d ("And while Robinhood's successful recruitment of inexperienced young

13  traders may have inadvertently minted a few new millionaires riding the debt-fueled market, it is also

14  deluding an entire generation into believing that trading options successfully is as easy as leveling up on

15  a video game.").

16  (ii)    Users Receive A Free Gift Of Stock Upon Signing Up

17       55.    Second, upon signing up, Robinhood users are gifted with a free stock.  Upon information

18  and belief, these stocks are actually penny stocks, trading below $5.00/share.  However, nowhere on

19  Robinhood's app or website does Robinhood describe its "gifted" stock.  A savvy investor would

20  understand the value of the stocks that are "gifted" by Robinhood.  But a young, inexperienced user

21  would not as likely know this, and be misled to think the free stock will have or gain significant value.

22  (iii)    While Pushing Users To Trade, Robinhood Boasts Charging Zero Commission

23       56.    Robinhood touts itself for not charging any fees to its users, a feature that is appealing to

24  inexperienced individuals with little or no income.  What Robinhood fails to disclose in its marketing

25  ploy is that Robinhood profits from order flow, that is, sending its users' orders to third-party broker-

26  dealers to execute the trades.  Thus, once Robinhood lures in its users, Robinhood starts generating profits

27  as soon as the users begin trading.  Robinhood has every incentive to push its users to trade options.

28  Upon information and belief, Robinhood was paid 58 cents per 100 shares for options contracts versus

**COMPLAINT**

only 17 cents per 100 for equities.  Jeff Kauflin, Antoine Gara, Sergei Klebnikov, *The Inside Story of Robinhood's Billionaire Founders, Option Kid Cowboys and the Wall Street Sharks that Feed on Them*, Forbes (Aug. 19, 2020), https://www.forbes.com/sites/jeffkauflin/2020/08/19/the-inside-story-of-robinhoods-billionaire-founders-option-kid-cowboys-and-the-wall-street-sharks-that-feed-on-them/?sh=33aea449268d.

57.     Though Robinhood has tried to de-emphasize the importance of options trading by stating that only 12% of its customers trade options, those trades accounted for 62% of Robinhood's order flow revenues in the first half of 2020 alone, which totaled approximately $270 million.  *Id.  See also* Robinhood Securities – Held NMS Stocks and Options Order Routing Public Report (Apr. 2020), https://cdn.robinhood.com/assets/robinhood/legal/RHS%20SEC%20Rule%20606a%20and%20607%20Disclosure%20Report%20Q2%202020.pdf; Kate Rooney, Maggie Fitzgerald, *Here's how Robinhood is raking in record cash on customer trades – despite making it free*, CNBC (Aug. 13, 2020), https://www.cnbc.com/2020/08/13/how-robinhood-makes-money-on-customer-trades-despite-making-it-free.html?__source=iosappshare%7Ccom.apple.UIKit.activity.Message.

58.     As Rep. Sean Casten put it, "Robinhood's entire business model is driven by order flow. They don't make their money by making you wealthier, they just push the order flow.  That's not technically illegal, but it's unethical.  And the time has come for the SEC and FINRA to protect investors like Alex."  *See* Avi Salzman, *Congressman Calls Robinhood 'Unethical' as Trading Start-Up Vows to Improve*, Barron's (Aug. 14, 2020), https://www.barrons.com/articles/robinhood-unethical-options-business-model-market-makers-suicide-51597439667.

59.     Indeed, under its payment structure, just in the first quarter of 2020, as posted on Robinhood's website, Robinhood received $59.8 million in payments for option trades alone.  *See* Robinhood Financial – Held NMS Stocks and Options Order Routing Public Report, 1st Quarter, 2020 (May 29, 2020), https://cdn.robinhood.com/assets/robinhood/legal/RHF%20SEC%20Rule%20606A%20and%20607%20Disclosure%20Report%20Q1%202020.pdf.



1
2
3
4
5
6
7
8
9
10
11 (iv)   <u>Robinhood Actively Urges Its Users To Trade On Margin And Pursue Option Trading</u>

12       60.   Given the potential for enormous profit under its payment structure, using multiple

13 techniques, Robinhood aggressively encourages its customers to trade.  First, Robinhood sends its users

14 unsolicited messages inviting them to apply for a margin account through its program, Robinhood Instant.

15 Second, Robinhood sets up links on its app to encourage customers to sign up for Robinhood Gold, its

16 subscription service whereby, among other things, users can have instant access to larger deposits and

17 can trade on margin for only $5 a month and a free thirty-day trial.  *See* Robin Wigglesworth, Richard

18 Henderson, Eric Platt, *The lockdown death of a 20-year old day trader*, Financial Times (Jul. 2, 2020),

19 https://www.ft.com/content/45d0a047-360f-4abf-86ee-108f436015a1.    Third,  Robinhood  prompts

20 customers to select a choice of investment experience upon opening an account, and if they select "I'm

21 an expert," they are simply invited to apply to trade options at the click of a button.  *See* Dusseault Letter

22 (Aug. 7, 2020), https://s.wsj.net/public/resources/documents/RobinhoodReplyToCongress.pdf.  Further,

23 each time users access their account menu tab in the app, Robinhood sends unsolicited notices entreating

24 them to trade options.  Robinhood also pushes these notifications when Android users seek to change

25 their order type from the default stock order.  *Id.*

26       61.   The problem with Robinhood's targeting inexperienced and unsophisticated users is that

27 these individuals lack the resources, insight, and knowledge that professional traders have amassed

28 throughout their careers.

**COMPLAINT**

14

**E. Cognition in Robinhood's Targeted Customers Is Not Fully Developed, Emphasizing An Even Stronger Need For Robinhood To Meet Its Duty Of Care To Them**

62.     Robinhood targets young and inexperienced customers by design.   Robinhood's aggressive ploys to attract young customers, combined with its flagrant disregard for its duty of care to its customers, creates a time bomb that was destined to lead to the type of tragedy that happened to Alex.

63.     Medical journals have researched the under-development of brains in individuals younger than 25, such as Alex who was 20 at the time at issue.

- "The rational part of a teen's brain isn't fully developed and won't be until age 25 or so.  Adults think with the prefrontal cortex, the brain's rational part.  This is the part of the brain that responds to situations with good judgment and awareness of long-term consequences.  Teens process information with the amygdala.  This is the emotional part.  In teen's brains, the connections between the emotional part of the brain and the decision-making center are still developing—and not always at the same rate.  That's why when teens have overwhelming emotional input, they can't explain later what they were thinking.  They weren't thinking as much as they were feeling."  *See Understanding the Teen Brain*, Univ. of Rochester Med. Ctr., Health Encyclopedia, https://www.urmc.rochester.edu/encyclopedia/content.aspx?ContentTypeID=1&ContentID=3051.

- "The frontal lobes, home to key components of the neural circuitry underlying 'executive functions' such as planning, working memory, and impulse control, are among the last areas of the brain to mature; they may not be fully developed until halfway through the third decade of life…. Executive functions are a set of supervisory cognitive skills needed for goal-directed behavior, including planning, response inhibition, working memory, and attention.  These skills allow an individual to pause long enough to take stock of a situation, assess his or her options, plan a course of action, and execute it."  *See* Sara B. Johnson Ph.D., M.P.H., Robert W. Blum, M.D., Ph.D., Jay N. Giedd, M.D., *Adolescent Maturity and the Brain: The Promise and Pitfalls of Neuroscience Research in Adolescence*, J. Adolesc. Health 2009, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2892678/.

**COMPLAINT**

15

- "One key part of that trajectory is the development of the prefrontal cortex, a significant part of the brain, in terms of social interactions, that affects how we regulate emotions, control impulsive behavior, assess risk and make long-term plans.  Also important are the brain's reward systems, which are especially excitable during adolescence.  But these parts of the brain don't stop growing at age 18.  In fact, research shows that it can take more than 25 years for them to reach maturity."  Stephen Johnson, *Why is 18 the age of adulthood if the brain can take 30 years to mature?*  Big Think (Mar. 20, 2019), https://bigthink.com/mind-brain/adult-brain?rebelltitem=1#rebelltitem1.

- In studying young adults, scientists have found that "[b]rain scans revealed that the regions of their brains in which emotion is processed were unusually active, while areas dedicated to keeping those emotions under control were weak.  'The young adults looked like teenagers,' said Laurence Steinberg, a psychologist at Temple University and an author of the study.  Dr. Steinberg agreed with Dr. Somerville that the maturing of the brain was proving to be a long, complicated process without obvious milestones."  Carl Zimmer, *You're an Adult.  Your Brian, Not So Much.*, N.Y. Times (Dec. 21, 2016), https://www.nytimes.com/2016/12/21/science/youre-an-adult-your-brain-not-so-much.html.

64.    Indeed, adolescents and young adults cognitively lack the ability to control impulses in the same way as fully mature adults.  Studies have linked impulsivity to suicide in adolescents and young adults.  "Suicide is the second leading cause of death among adolescents, and impulsivity has emerged as a promising marker of risk."  Randy P. Auerback, Jeremy G. Stewart, *et al., Impulsivity and Suicidality in Adolescent Inpatients*, J. Abnorm. Child Psych. (Jan. 2017), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5045310/.  Research has brought out that "[r]ecent developments suggest that emotion-relevant impulsivity, particularly negative urgency (i.e., a strong and immediate need to avoid undesirable emotions or physical sensations) is distinct from other forms of impulsivity and may be associated with suicide attempts."  *Id.*

65.    Studies have reported that the highest number of suicides occur in adolescents and young adults.  "[S]uicide ranks higher as a cause of death during youth compared with other age groups.  It is the second leading cause of death during childhood and adolescence, whereas it is the tenth leading cause

**COMPLAINT**

16

of death among all age groups." Christine B. Cha, Peter J. Franz, *et al., Annual Research Review: Suicide among youth – epidemiology, (potential) etiology, and treatment*, J. of Child Psychology and Psychiatry (Nov. 1, 2017), https://acamh.onlinelibrary.wiley.com/doi/10.1111/jcpp.12831.

66.     Trading can have major financial consequences.  Broker-dealers owe all customers a duty of care to ensure that sound and appropriate trading decisions are made.  Where broker-dealers target younger populations whose cognitive development has not fully matured, in particular the prefrontal cortex of the brain, as Robinhood does, there is an even stronger need to thoroughly fulfill the duty of care and protect these customers.

**F. Robinhood's Reckless Practices Directly and Proximately Caused The Death Of Alex**

67.     Alex fell prey to all of Robinhood's tactics.  Prior to even graduating high school, Alex opened an account with Robinhood, which Robinhood readily approved.  Within only a few months, despite Alex being only eighteen years old and having little or no income, Robinhood approved Alex for trading in options.  On information and belief, during his freshman year at UNL, Alex began trading options on his Robinhood account.

68.     At 11:01 p.m. on June 11, 2020, Alex received an email from Robinhood informing him that his account was restricted.  Minutes later, Robinhood then assigned Alex, obligating him to purchase underlying securities linked to options he had sold.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15



16   69.   The email sent by Robinhood failed to clarify that buying power and negative cash are not

17  the same as normal debt.  Thus, the $730,000 may have reflected an options trade that had not yet settled

18  and the value of stocks tied to those options.  A corresponding trade to cover a purchase may not be

19  executed until the following trading day.  In these instances, as here, cash and buying power will appear

20  as negative until the other side is processed.  Thus, the display of negative $730,000 did not reflect actual

21  debt, but rather, an option trade that had not yet settled.  In addition, although the full details of the trades

22  Alex made are within Robinhood's exclusion possession and control, the $730,000 negative cash balance

23  appears inconsistent with Alex's known trades.  On information and belief, the options that were assigned

24  to Alex involved 2400 shares of IMW at $155 per share, for a total trade value of approximately $372,000.

25  For this additional reason, the $730,000 negative cash balance appears both misleading and inaccurate.

26   70.   Robinhood's users—who it aggressively targeted—are generally inexperienced and do

27  not possess market savviness.  Robinhood had an obligation to make trading and account activity clear

28  for its users.  It is entirely reasonable and foreseeable that a twenty-year old kid would not comprehend

**COMPLAINT**

the meaning behind the account calculation he received.  But Robinhood's email made no attempt to clarify that.

71.     And when Alex desperately tried to contact Robinhood for clarification—multiple times—Robinhood was nowhere to be found.  Rather, in an obvious effort to boost profits at the expense of its customers, Robinhood made no live customer service personnel available to its customers like Alex.  Robinhood restricted his account at 11:01pm and sent him notice of a debit balance of $730,000, and then sent him a REG T call at 3:26am for $178,000, but they had no one available to answer his three (3) desperate emails.  Indeed, on information and belief, Robinhood outsourced its customer service function, and at some point terminated its live telephone customer service because it didn't want to pay for licensed, knowledgeable professionals to respond to inquiries like Alex's.

72.     Alex promptly emailed Robinhood's support email address seeking help and stating, "I was recently assigned on puts I sold in a spread.  As of tonight, my buying power is over -700,000.  Will the puts that I bought cover this transaction?"  Robinhood's response consisted of an automated email, emphasizing delays in response time and creating a case number.

73.     After having fully ignored Alex's question, at 3:26 a.m., Robinhood sent Alex an alarming email entitled "Immediate Action Required: Reg T Call Due."  Robinhood's email warned Alex that his "account didn't meet the Regulation T cash requirements for [his] trades on June 10, 2020[,]" and that he was thus required to deposit $178,612.73 by June 17, 2020.  Robinhood's email was fatal.  In reality, Alex did not owe any money; he simply needed to close out his position.  Had Robinhood acted responsibly and properly, it either never would have allowed Alex to make these trades he didn't understand, would not have allowed such an email to be sent (to a young and inexperienced customer, no less), or, at the very least, it would have ensured that someone from the company would respond to Alex to clarify the meaning of the emails.  But Robinhood never bothered to explain any of this to Alex, and instead, sent (or programmed its computer to send) this devastating and inaccurate email in the middle of the night for Alex to make sense of on his own.

74.     A few hours later, presumably having seen Robinhood's email, Alex again wrote to customer support, stating he was incorrectly assigned more than he should have been and that the puts he purchased should have covered the puts he sold.  Alex again asked for help, but he was only met with

another auto-generated reply from Robinhood assigning a new case number.  Still believing he owed nearly $200,000 and was perhaps as much as $730,000 in debt, Alex *again* emailed Robinhood, and out of desperation, threatened legal action.  Though Alex's panic and confusion caused by Robinhood's emails was abundantly clear, Robinhood was completely unavailable to fix the mess it had created.  Alex only received another automated reply, generating yet another case number.

75.    Within the next several hours, never once receiving a substantive response from Robinhood and believing he had nowhere to turn, Alex ran in front of an oncoming train.  He was pronounced dead later that day.

76.    Though nothing stopped Robinhood from sending its own emails to Alex—emails which created a horrifying panic with devastating consequences—at no time did a live person from Robinhood reply to or otherwise contact Alex to attempt to alleviate the mix-up it created.  Upon information and belief, Robinhood has nearly 1,300 employees.  Had any one of these employees bothered to respond to Alex, or had Robinhood done so much as provide a contact number to its users, Alex would not have woken up in sheer panic on June 12.  He would not have taken a pen and written his final note.  He would not have taken his final bike ride to the train tracks.  He would not have given into the uncontrollable impulse to run in front of an oncoming train and end his life.  Alex would have been alive and well today.

77.    In Alex's own words in his suicide note, he specifically stated that he did not want to die.  Instead, Alex believed the only way to save his family from financial hardship caused by his confusion over Robinhood's program was to commit suicide.  Even in his darkest moment, Alex's first priority was the people he loved.  He was impelled by desperation and a false belief caused by Robinhood's acts and omissions into believing he had no other option but suicide.  Despite not wanting to die, given his young age, inexperienced, and under-developed prefrontal cortex and impulse control, Alex simply could not control the belief that suicide was the only way out and the deadly and uncontrollable impulse resulting from that belief.

78.    Alex's last known written words stated: "If you're reading this, I am dead.  How was a 20 year old with no income able to get assigned almost a million dollars' worth of leverage?  The puts I bought/sold should have cancelled out, too, but I also have no clue what I was doing now in hindsight.  There was no intention to be assigned this much and take this much risk, and I only thought that I was

risking the money that I actually owned.  If you check the app, the margin investing option isn't even 'turned on' for me.  A painful lesson.  Fuck Robinhood.  I was starting to look forward to my future, too, before I hit this pretty large speedbump.  I cannot imagine the amount of pain this has caused you.  Please understand that this decision was not made lightly.  You could fill an ocean with the amount of tears I've shed typing this.  Please, please take care of yourselves.  The amount of my guilt I feel as I commit to this is unbearable – **I did not want to die**."

79.    Alex's own words – "I did not want to die" are indicative of his uncontrollable, impulsive feeling that he had no other choice in the situation.  The situation being, of course, Robinhood's breach of its duty of care to Alex as its customer, evidenced by its failure to adequately verify that Alex should be trading on its platform, leveraging irresponsible amounts to him without ever investigating the appropriateness of same, sending him misleading and inaccurate account information that caused him to panic, and failing to respond to his desperate pleas for help.  Alex's own words leave no doubt that Robinhood's actions were the direct and proximate cause of his death.

## G. Recognizing Its Reckless Practices, Robinhood Has Implemented Changes To Its Business Directly Following Alex's Death

80.    Alex's death sparked devastation and outrage both in and outside of the financial world.

81.    Realizing the gravity of the situation, just days after Alex's death, the Co-Founders and Co-CEOs of Robinhood, Vlad Tenev ("Tenev") & Baiju Bhatt ("Bhatt"), posted a public letter on Robinhood's website, acknowledging the link between their product and Alex's death and noting that "[o]ver the past week, our team at Robinhood has been focused on identifying how we can improve Robinhood's customer experience, specifically around option flows involving multi-leg exercise and assignment."  *See* Commitments to Improving our Options Offering, (Jun. 19, 2020), https://blog.robinhood.com/news/2020/6/19/commitments-to-improving-our-options-offering.  Such changes include: new criteria for eligibility to trade options; provision of educational resources related to options trading; and improving emails sent to users about multi-leg options spreads.  *Id.*

82.    On July 13, 2020, Rep. Sean Casten of Illinois, among other Congressmen and Congresswomen, asked Tenev and Bhatt exactly how their proposed changes to their account approval

process "will have any meaningful impact on the ways [their] platform enables and encourages inexperienced investors to engage in high risk trading."

83.     In his August 7, 2020 response to the inquiries from Congress, Dusseault, President and COO of Robinhood Financial LLC, a unit of Robinhood, stated "[w]e know we have a responsibility to our customers, including by providing educational content to support and inform their investing experience.   We take this responsibility seriously."   *See* Dusseault Letter (Aug. 7, 2020), https://s.wsj.net/public/resources/documents/RobinhoodReplyToCongress.pdf.   Dusseault continued, "[y]our letter understandably focuses on our options offering, and products such as options and margin trading, which are considered riskier than buying and selling equities in a cash account." *Id*.

84.     Dusseault further confirmed that Robinhood "will be implementing additional criteria for customers seeking Level 3 options authorization, which includes spreads trades.   For example, we are considering requirements for Level 3 options trading access"—something Robinhood should have done from day one.  However, even to this day, Robinhood refuses to be transparent about how it approves traders for option trading.

85.     Dusseault continued that Robinhood had "already made significant changes to improve the educational content platform," including a Help Center and Learn website "which provides a variety of educational content on all kinds of investing topics, including options trading (from explaining the basics of what an option is and how it works to explaining various options trading strategies)." *Id*. Robinhood further added information "on early options assignments and negative buying power" to its Help Center and planned to hire an Options Education Specialist "to further enhance education related to options trading." *Id*.  Again, these were all things Robinhood should have done—but failed to do—since day one.

86.     Dusseault further noted that Robinhood was refining its user interface "to enhance clarity and promote customer understanding" which includes "in-app messages and emails, including additional detail to the in-app history page, to help customers understand the mechanics of early assignments on multi-leg options spreads."   Another thing that Robinhood should have done from the start, but inexplicably, failed to.

87.     Notably, Dusseault's letter did not make any reference to its complete lack of human contact, either in terms of sending or responding to emails or answering phones, and still is yet to address this crucial feature which, had Robinhood implemented as it should have, could and would have saved Alex's life.  Robinhood still fails to provide a telephone number for its customers to call with questions.

88.     Nor has Robinhood expressed the desire to meet any suitability and KYC requirements under FINRA.

89.     Indeed, Robinhood's response has faced criticism for falling woefully short of meaningfully addressing its problems.  Rep. Sean Casten was not impressed, noting that Robinhood continues to "make money by pushing inexperienced investors into high-risk decisions."  *See* Avi Salzman, *Congressman Calls Robinhood 'Unethical' as Trading Start-Up Vows to Improve*, Barron's (Aug. 14, 2020),   https://www.barrons.com/articles/robinhood-unethical-options-business-model-market-makers-suicide-51597439667.

90.     Additionally, on or about December 16, 2020, the securities regulators in the State of Massachusetts filed an action against Robinhood, echoing the concerns stated herein.  The complaint cited particular issue with Robinhood's provision of a platform to customers to "make potentially an unlimited number of trades[,]" noting that "Robinhood gave hundreds of customers with limited or no investment experience the ability to make thousands of trades in a matter of months."  *See* Complaint, In the Matter of:  Robinhood Financial, LLC, Dkt. No. E-2020-0047, (Dec. 16, 2020), https://www.sec.state.ma.us/sct/current/sctrobinhood/MSD-Robinhood-Financial-LLC-Complaint-E-2020-0047.pdf.  It further condemned Robinhood's failure to "properly screen customer profiles and allow[ance of] thousands of inexperienced investors to engage in very risky trading activity[, w]hile encouraging constant engagement with its platform." *Id*.

91.     Robinhood's business practices remain reckless and fall exceedingly short of satisfying its duty of care to its customers.  As a direct and proximate result of Robinhood's acts and/or omissions, Plaintiffs have sustained damages in the worst way—the loss of someone they love.  And if Robinhood is not held accountable, there will be many more families to share in Plaintiffs' pain.

**FIRST CAUSE OF ACTION**

**(Wrongful Death)**

92.    Plaintiffs re-allege and incorporate by reference each and every allegation and statement set forth above as if fully set forth herein.

93.    Plaintiffs are informed and believe, and thereon allege, that at all times mentioned herein, Defendants owed a duty of care to their customers, including Alex.

94.    Plaintiffs are informed and believe, and thereon allege, that Defendants had a duty to ensure suitability of both the investment strategy and trades for their customers, including Alex, that is, safeguarding that the trades made, and investment strategies implemented, by its customers were suitable for their age, experience, investment knowledge, and available funds.

95.    Plaintiffs are informed and believe, and thereon allege, that Defendants had a duty to know their customers, including Alex, which necessarily includes verification of its customers' identities, verification of its customers' employment status, source of income, and net worth, and an understanding of its customers' investment objectives and risk tolerance.

96.    Plaintiffs are informed and believe, and thereon allege, that Defendants negligently, carelessly, recklessly, wantonly, and unlawfully breached their duties of care to Alex.  Plaintiffs are informed and believe, and thereon allege, that Defendants breached their duty of care by, among other things, relying on its customers' answers to questions regarding their source of income, experience, net worth and investment objectives, including those of Alex.

97.    Plaintiffs are informed and believe, and thereon allege, that Defendants negligently, carelessly, recklessly, wantonly, and unlawfully breached their duty of care by relying on third-party credit card companies to verify customers' responses to Defendants' questions regarding age and identity, including those of Alex.

98.    Plaintiffs are informed and believe, and thereon allege, that Defendants negligently, carelessly, recklessly, wantonly, and unlawfully breached their duty of care by failing to implement any system to verify or review the information provided by customers, including Alex, to ensure suitability of trading.

99.     Plaintiffs are informed and believe, and thereon allege, that Defendants breached their duty of care by specifically targeting inexperienced and young investors, including Alex, by: designing its app to appear as a video game devoid of real world consequences; aggressively pushing its users, including Alex, to engage in options and margin trading; and flaunting its program as "free" for users, including Alex, without any transparency that it profited off of the mere act of its users' trades.  Plaintiffs are informed and believe, and thereon allege, that Defendants knew or reasonably should have known the customers it targeted, including Alex, would not adequately comprehend the significance of their trading decisions or the risks of the trades.

100.    Plaintiffs are informed and believe, and thereon allege, that Defendants breached their duty of care by failing to explain their summaries of account activity to its users, including Alex.

101.    Plaintiffs are informed and believe, and thereon allege, that Defendants breached their duty of care in negligently, carelessly, recklessly, wantonly, and unlawfully posting a notice that made it appear as if he had lost $730,000 when he had not, and by negligently sending Alex a Regulation T call that was misleading, stating falsely that he was required to deposit $178,612.73 within a few days.

102.    Plaintiffs are informed and believe, and thereon allege, that Defendants breached their duty of care by negligently, carelessly, recklessly, wantonly, and unlawfully failing to respond to Alex's emails or otherwise provide any customer support whatsoever to Alex, neither by phone nor email, particularly after having negligently, carelessly, recklessly, wantonly, and unlawfully emailed Alex with inaccurate and misleading account information.

103.    The death of Alex occurred as a direct and proximate cause of Defendants' breaches of its duty of care by causing in Alex an uncontrollable impulse to commit suicide.

104.    As a direct and proximate result of the reckless and negligent conduct of Defendants, Plaintiffs have sustained damages resulting from the loss of love, affection, society, service, comfort, support, right of support, expectations of future support and counseling, companionship, solace and mental support, as well as other benefits and assistance from Alex, in an exact amount in excess of the jurisdictional minimum to be proven at trial pursuant to Section 425.10 of the California Code of Civil Procedure.

---

**COMPLAINT**

105.    As a direct and proximate result of the reckless and negligent conduct of Defendants, Plaintiffs will be deprived of the financial support and assistance of Alex the exact amount of which to be proven at trial pursuant to Section 425.10 of the California Code of Civil Procedure.

## SECOND CAUSE OF ACTION

### (Negligent Infliction of Emotional Distress)

106.    Plaintiffs re-allege and incorporate by reference each and every allegation and statement set forth above as if fully set forth herein.

107.    At all times relevant herein, Defendants acted negligently.   Defendants negligently targeted young and inexperienced customers without taking any steps to protect its targets from the pitfalls of trading, and Defendants knew or should have known their customers, including Alex, lacked the sophistication necessary to comprehend their trading activity.   Defendants negligently approved the opening of trading accounts of young and inexperienced investors, without conducting the necessary diligence to ensure such users were suitable to trade.   Defendants negligently provided their users, including Alex, hundreds of thousands of dollars leverage through margin and options, despite the fact that many of its users, including Alex, had little to no income and insufficient experience or understanding of the trades they were permitted to make on Robinhood's platform.   Defendants negligently failed to provide any human customer service contact for their users, including Alex, and further negligently failed to respond to any of Alex's inquiries and pleas.

108.    As a direct and proximate result of Defendants' negligence, Plaintiffs have suffered serious emotional distress, including but not limited to emotional trauma, suffering, anguish, grief, anxiety, shock, mental distress, and shame.

109.    As a direct and proximate result of Defendants' negligence, Plaintiffs are entitled to compensatory damages, in an exact amount to be proven at trial.

## THIRD CAUSE OF ACTION

### (Unfair Business Practices In Violation Of Cal. Bus. & Prof. Code § 17200, *et seq.*)

110.    Plaintiffs re-allege and incorporate by reference each and every allegation and statement set forth above as if fully set forth herein.

111.    Business and Professions code section 17200, *et seq.*, ("unfair competition law") prohibits any unlawful, unfair or fraudulent business act or practice, any unfair, deceptive, untrue or misleading advertising, and any violation of Business and Professions Code section 17500 *et seq.*

112.    At all times mentioned herein, Defendants engaged in unfair business practices because its conduct was immoral, unethical, oppressive, unscrupulous and substantially damaging to Plaintiffs. Specifically, and without limitation, the particular offensive conduct includes: (a) knowingly and intentionally targeting young and inexperienced individuals, including Alex, to open accounts on its platform; (b) knowingly and intentionally approving young and inexperienced individuals to open trading accounts, including Alex, without independently verifying any of the information provided; (c) knowingly and intentionally concealing the source of its profit—order flow—while simultaneously knowingly and intentionally encouraging its users, including Alex, to trade on its app and website, regardless of their age, source of income, and experience; (d) failing to implement proper compliance oversight; (e) failing to provide any customer service to support its users, while knowing such users—young and inexperienced—would inevitably need such support; (f) sending its users, including Alex, misleading and inaccurate account information; and (g) failing to respond to its users' inquiries, including those of Alex.

113.    At all times mentioned herein, Defendants engaged in fraudulent business practices. Specifically, and without limitation, Defendants' fraudulent conduct includes: (a) knowingly and intentionally failing to vet its users by verifying their suitability (i.e., age, identity, source of income, net worth, investment experience); (b) knowingly and intentionally failing to disclose that it profited from order flow, or, in other words, the act of its customers making trades, regardless of their value, while pushing its customers to maximize their trading activity through sending push notifications, offering incentives (including offering shares of "glamour stocks" in persuading other customers to open accounts, gifting free stocks upon signing up, and boasting a margin trading platform for anyone to use, at only $5 per month with a thirty-day free trial); and (c) providing reckless amounts of leveraged money to its users.

114.    Members of the public are likely to be deceived by Defendants' fraudulent business practices.

115.    As a direct and proximate result of Defendants' wrongful acts, Plaintiffs suffered harm and losses as described herein and in amounts to be proven at trial.  Plaintiffs are entitled to restitution from Defendants, and will seek injunctions or other appropriate orders to remedy the unfair practices described herein.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs prays for the following relief:

1.  Non-economic damages suffered by Plaintiffs including, but not limited to, loss of love, affection, care, society, service, comfort, support, right to support, companionship, solace or moral support, expectations of future support and counseling, other benefits and assistance of Alex, in an amount in excess of the jurisdictional minimum, according to proof;

2.  Economic damages suffered by Plaintiffs relating to loss of financial support from Alex, according to proof;

3.  Funeral and burial expenses suffered by Plaintiffs, according to proof;

4.  Incidental expenses suffered by Plaintiffs, according to proof;

5.  Restitution;

6.  Pre-and post-judgment interest;

7.  Injunctive or other equitable relief as appropriate;

8.  Any other relief as the Court may deem just and proper.

Date:  February 8, 2021                          **BROWN NERI SMITH & KHAN LLP**


By:  _____
       Ethan J. Brown
       *Attorneys for Plaintiffs Dan Kearns, Dorothy*
       *Kearns, Sydney Kearns*

**COMPLAINT**

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury.


Date:  February 8, 2021                    **BROWN NERI SMITH & KHAN LLP**


By: _____
    Ethan J. Brown
    *Attorneys for Plaintiffs Dan Kearns, Dorothy*
    *Kearns, Sydney Kearns*

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

<table>
<tr><td></td><td><strong>FOR COURT USE ONLY</strong><br><em>(SOLO PARA USO DE LA CORTE)</em></td></tr>
</table>

E-FILED
2/8/2021 9:51 AM
Clerk of Court
Superior Court of CA,
County of Santa Clara
21CV375872
Reviewed By: R. Walker
Envelope: 5796634

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
ROBINHOOD FINANCIAL LLC; ROBINHOOD SECURITIES, LLC; ROBINHOOD MARKETS, INC.; and DOES 1-10

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):* DAN KEARNS, an individual;

DOROTHY KEARNS, an individual; and SYDNEY KEARNS, an individual

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.
*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is: | CASE NUMBER *(Número del Caso):* |
| --- | --- |
| *(El nombre y dirección de la corte es):* | 21CV375872 |

Santa Clara County for the Superior Court of
California 191 North 1st Street, San Jose, CA 95113

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is: *(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):* Benjamin Blakeman, BLAKEMAN LAW, 11601 Wilshire Blvd., Suite 2080, Los Angeles CA 90025, 213-629-9922; Additional Attorneys Are On Attachment Form

| DATE:<br>*(Fecha)* 2/8/2021 9:51 AM | Clerk of Court | Clerk, by<br>*(Secretario)* R. Walker | , Deputy<br>*(Adjunto)* |
| --- | --- | --- | --- |

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010).)*


[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*

   under: ☐ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership)   ☐ CCP 416.90 (authorized person)
   ☐ other *(specify):*
4. ☐ by personal delivery on *(date)*

Page 1 of 1

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-100 [Rev. July 1, 2009] | **SUMMONS** | Code of Civil Procedure §§ 412.20, 465<br>*www.courts.ca.gov* |
| --- | --- | --- |

**SUM-200(A)**

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| DAN KEARNS et al. v. ROBINHOOD FINANCIAL LLC et al. | **21CV375872** |

## INSTRUCTIONS FOR USE

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

**List additional parties** *(Check only one box. Use a separate page for each type of party.)*:

[X] Plaintiff  [ ] Defendant  [ ] Cross-Complainant  [ ] Cross-Defendant

ADDITIONAL ATTORNEYS FOR THE PLAINTIFFS:

Ethan J. Brown, BROWN NERI SMITH & KHAN LLP, 11601 Wilshire Boulevard, Suite 2080,
Los Angeles, CA 90025 (310) 593-9890

Marc Zussman, LAW OFFICES OF MARC I. ZUSSMAN, 10100 Santa Monica Boulevard, Suite 300
Los Angeles, CA 90067 (424) 268-4024

Page _____ of _____

**Page 1 of 1**

Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Brown Neri Smith & Khan LLP<br>Ethan J. Brown (SBN 218814)<br>11601 Wilshire Blvd., Suite 2080     Los Angeles, CA 90025<br><br>TELEPHONE NO.: (310) 593-9890     FAX NO. *(Optional):* (310) 593-9980<br>ATTORNEY FOR *(Name):* Dan Kearns, Dorothy Kearns, and Sydney Kearns | **Electronically Filed<br>by Superior Court of CA,<br>County of Santa Clara,<br>on 2/8/2021 9:51 AM<br>Reviewed By: R. Walker<br>Case #21CV375872<br>Envelope: 5796634** |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** Santa Clara
STREET ADDRESS: 191 N. First Street
MAILING ADDRESS:
CITY AND ZIP CODE: San Jose 95113
BRANCH NAME:

CASE NAME: Dan Kearns et al. v. Robinhood Financial LLC et al.

| **CIVIL CASE COVER SHEET** | | **Complex Case Designation** | CASE NUMBER:<br>**21CV375872** |
|---|---|---|---|
| [x] **Unlimited** (Amount demanded exceeds $25,000) | [ ] **Limited** (Amount demanded is $25,000) | [ ] Counter  [ ] Joinder<br><br>Filed with first appearance by defendant *(Cal. Rules of Court, rule 3.402)*  DEPT.: | JUDGE: **Hon. Sunil R. Kulkarni / D1** |

*Items 1–6 below must be completed (see instructions on page 2).*

**1.** Check **one** box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[x] Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)
**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)
**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)
**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)
**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
[ ] Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint *(not specified above)* (42)
**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

**2.** This case [ ] is [x] is not     complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

**3.** Remedies sought *(check all that apply):* a. [x] monetary b. [ ] nonmonetary; declaratory or injunctive relief c. [x] punitive
**4.** Number of causes of action *(specify):* three
**5.** This case [ ] is [x] is not     a class action suit.
**6.** If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*
Date: February 8, 2021

Ethan J. Brown
_____
(TYPE OR PRINT NAME)                                                    (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courts.ca.gov

CM-010

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the Civil Case Cover Sheet contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property Damage/Wrongful Death
Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
  Asbestos Property Damage
  Asbestos Personal Injury/ Wrongful Death
Product Liability *(not asbestos or toxic/environmental)* (24)
Medical Malpractice (45)
  Medical Malpractice– Physicians & Surgeons
  Other Professional Health Care Malpractice
Other PI/PD/WD (23)
  Premises Liability (e.g., slip and fall)
  Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
  Intentional Infliction of Emotional Distress
  Negligent Infliction of Emotional Distress
  Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
  Legal Malpractice
  Other Professional Malpractice *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
  Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
  Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
  Negligent Breach of Contract/ Warranty
  Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
  Collection Case–Seller Plaintiff
  Other Promissory Note/Collections Case
Insurance Coverage *(not provisionally complex)* (18)
  Auto Subrogation
  Other Coverage
Other Contract (37)
  Contractual Fraud
  Other Contract Dispute

**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
  Writ of Possession of Real Property
  Mortgage Foreclosure
  Quiet Title
  Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
  Writ–Administrative Mandamus
  Writ–Mandamus on Limited Court Case Matter
  Writ–Other Limited Court Case Review
Other Judicial Review (39)
  Review of Health Officer Order
  Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
  Abstract of Judgment (Out of County)
  Confession of Judgment *(non-domestic relations)*
  Sister State Judgment
  Administrative Agency Award *(not unpaid taxes)*
  Petition/Certification of Entry of Judgment on Unpaid Taxes
  Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
  Declaratory Relief Only
  Injunctive Relief Only *(non-harassment)*
  Mechanics Lien
  Other Commercial Complaint Case *(non-tort/non-complex)*
  Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition *(not specified above)* (43)
  Civil Harassment
  Workplace Violence
  Elder/Dependent Adult Abuse
  Election Contest
  Petition for Name Change
  Petition for Relief From Late Claim
  Other Civil Petition

**CIVIL CASE COVER SHEET**

**For your protection and privacy, please press the Clear This Form button after you have printed the form.**

| Print this form | Save this form | Clear this form |

**ATTACHMENT CV-5012**

# CIVIL LAWSUIT NOTICE

## 21CV375872

*Superior Court of California, County of Santa Clara*
*191 North First St., San José, CA  95113*

CASE NUMBER: _____

<div style="border:1px solid black; text-align:center;">

### PLEASE READ THIS ENTIRE FORM

</div>

*PLAINTIFF* (the person suing):  Within 60 days after filing the lawsuit, you must serve each Defendant with the *Complaint*, *Summons*, an *Alternative Dispute Resolution (ADR) Information Sheet*, and a copy of this *Civil Lawsuit Notice*, and you must file written proof of such service.

---

**DEFENDANT** (The person sued):  **You must do each of the following to protect your rights:**

1. You must file a **written response** to the *Complaint, using the proper legal form or format*, in the Clerk's Office of the Court, within **30 days** of the date you were served with the *Summons* and *Complaint*;
2. You must serve by mail  a copy of your written response on the  Plaintiff's attorney or on the Plaintiff if Plaintiff has no attorney (to "serve by mail" means to have an adult other than yourself mail a copy); and
3. You must attend the first Case Management Conference.

   **Warning:  If you, as the Defendant, do not follow these instructions, you may automatically lose this case.**

---

**RULES AND FORMS:**  You must follow the California Rules of Court and the Superior Court of California, County of <_CountyName_> Local Civil Rules and use proper forms.  You can obtain legal information, view the rules and receive forms, free of charge, from the Self-Help Center at 201 North First Street, San José (408-882-2900 x-2926).

- State Rules and Judicial Council Forms:  www.courtinfo.ca.gov/forms and www.courtinfo.ca.gov/rules
- Local Rules and Forms:  http://www.sccsuperiorcourt.org/civil/rule1toc.htm

**CASE MANAGEMENT CONFERENCE (CMC):**  You must meet with the other parties and discuss the case, in person or by telephone at least 30 calendar days before the CMC.  You must also fill out, file and serve a *Case Management Statement* (Judicial Council form CM-110) at least 15 calendar days before the CMC.

   *You or your attorney must appear at the CMC.*  *You may ask to appear by telephone – see Local Civil Rule 8.*

<div style="border:1px solid black;">

Your Case Management Judge is: **Hon. Sunil R. Kulkarni**     Department: **1**

The 1st CMC is scheduled for:  (Completed by Clerk of Court)

Date: **06/03/21**  Time: **2:30 p.m.**  in Department: **1**

The next CMC is scheduled for:  (Completed by party if the 1st CMC was continued or has passed)

Date: _____  Time: _____  in **Department**: _____

</div>

**ALTERNATIVE DISPUTE RESOLUTION (ADR):**  If all parties have appeared and filed a completed *ADR Stipulation Form* (local form CV-5008) at least 15 days before the CMC, the Court will cancel the CMC and mail notice of an ADR Status Conference. Visit the Court's website at www.sccsuperiorcourt.org/civil/ADR/ or call the ADR Administrator (408-882-2100 x-2530) for a list of ADR providers and their qualifications, services, and fees.

**WARNING:** Sanctions may be imposed if you do not follow the California Rules of Court or the Local Rules of Court.

<span style="color:red; border:1px solid red;">**Reset Form**</span>

---

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PROOF OF SERVICE**

*Dan Kearns, et al. v. Robinhood Financial LLC, et al.*
Case No.

**STATE OF CALIFORNIA, COUNTY OF SAN FRANCISCO**

At the time of service, I was over 18 years of age and not a party to this action.  I am employed in the County of San Francisco, State of California.  My business address is 235 Montgomery Street, 17th Floor, San Francisco, CA 94104.

On February 9, 2021, I served true copies of the following document(s) described as

**NOTICE OF REMOVAL**

**CIVIL COVER SHEET**

on the interested parties in this action as follows:

**SEE ATTACHED SERVICE LIST**

**BY FEDEX:**  I enclosed said document(s) in an envelope or package provided by FedEx and addressed to the persons at the addresses listed in the Service List.  I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of FedEx or delivered such document(s) to a courier or driver authorized by FedEx to receive documents.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on February 9, 2021, at San Francisco, California.

_____
Janetta Wingard

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

PROOF OF SERVICE

38567\13929075.1

1

**SERVICE LIST**

2

3   Benjamin Blakeman
    BLAKEMAN LAW
4   11601 Wilshire Boulevard, Suite 2080
    Los Angeles, California 90025
5

6   Ethan J. Brown
    BROWNNERI SMITH & KHANLLP
7   11601 Wilshire Boulevard, Suite 2080
    Los Angeles, California 90025
8

9   Marc Zussman
    LAWOFFICES OF MARCI.ZUSSMAN
10  10100 Santa MonicaB1Vd., Suite 300
    Los Angeles, CA 90067
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

PROOF OF SERVICE

38567\13929075.1